## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAUL CEPERNICK, On Behalf of Himself And All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO. _____** |
| Plaintiff, | ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** ) **FOR VIOLATIONS OF** |
| VIROPHARMA, INC., CLAUDE H. NASH and MICHEL DE ROSEN, | ) **FEDERAL SECURITIES LAWS** ) ) |
| Defendants. | ) ) **JURY TRIAL DEMANDED** ) ) |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by ViroPharma, Inc. ("ViroPharma" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of ViroPharma between July 13, 1999 and March 19, 2002, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   ViroPharma maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Paul Cepernick, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of ViroPharma at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant ViroPharma is a Delaware corporation with its principal place of business located at 405 Eagleview Boulevard, Exton, PA 19341.  The Company purports to be a pharmaceutical company dedicated to the commercialization, development and discovery of new antiviral medicines. The Company has purportedly focused its product development and discovery activities on a number of ribonucleic acid (RNA) virus diseases, including viral

respiratory infection (VRI), often referred to as the common cold. Other disease in which

ViroPharma focuses its product development activities on include respiratory syncytial virus

disease (RSV) and hepatitis C.

8.    (a)  Defendant Claude H. Nash ("Nash") was, at all relevant times, the Chairman

of ViroPharma.

(b)  Defendant Michel de Rosen ("de Rosen") was, at all relevant times,

ViroPharma's President and Chief Executive Officer.

(c)  Defendants Nash and de Rosen are collectively referred to herein as the

"Individual Defendants."

9.    Because of the Individual Defendants' positions with the Company, they had

access to the adverse undisclosed information about the Company's business, operations,

products, operational trends, financial statements, markets and present and future business

prospects via access to internal corporate documents (including the Company's operating plans,

budgets and forecasts and reports of actual operations compared thereto), conversations and

connections with other corporate officers and employees, attendance at management and Board

of Directors meetings and committees thereof and via reports and other information provided to

them in connection therewith.

10.    It is appropriate to treat the Individual Defendants as a group for pleading

purposes and to presume that the false, misleading and incomplete information conveyed in the

Company's public filings, press releases and other publications as alleged herein are the

collective actions of the narrowly defined group of defendants identified above.  Each of the

above officers of ViroPharma, by virtue of their high-level positions with the Company, directly

participated in the management of the Company, was directly involved in the day-to-day opera-

tions of the Company at the highest levels and was privy to confidential proprietary information

concerning the Company and its business, operations, products, growth, financial statements, and

financial condition, as alleged herein.  Said defendants were involved in drafting, producing,

reviewing and/or disseminating the false and misleading statements and information alleged

herein, were aware, or recklessly disregarded, that the false and misleading statements were being

issued regarding the Company, and approved or ratified these statements, in violation of the

federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common

stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the

NASDAQ, and governed by the provisions of the federal securities laws, the Individual

Defendants each had a duty to disseminate promptly, accurate and truthful information with

respect to the Company's financial condition and performance, growth, operations, financial

statements, business, products, markets, management, earnings and present and future business

prospects, and to correct any previously-issued statements that had become materially misleading

or untrue, so that the market price of the Company's publicly-traded securities would be based

upon truthful and accurate information.  The Individual Defendants' misrepresentations and

omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or

approval of the various public and shareholder and investor reports and other communications

complained of herein and were aware of, or recklessly disregarded, the misstatements contained

therein and omissions therefrom, and were aware of their materially false and misleading nature.

4

Because of their Board membership and/or executive and managerial positions with ViroPharma, each of the Individual Defendants had access to the adverse undisclosed information about ViroPharma's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about ViroPharma and its business issued or adopted by the Company materially false and misleading.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of ViroPharma common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme:  (i) deceived the investing public regarding ViroPharma's business, operations, management and the intrinsic value of ViroPharma common stock;  (ii) enabled ViroPharma insiders to sell more than $35 million worth of their personally-held ViroPharma common stock during the Class Period; (iii) enabled ViroPharma to raise hundreds of millions of

dollars though the sale of additional securities to the unknowing public; and (iv) caused plaintiff and other members of the Class to purchase ViroPharma securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of ViroPharma between July 13, 1999 and March 19, 2002, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ViroPharma common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ViroPharma or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)  whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ViroPharma; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     ViroPharma purports to be a pharmaceutical company dedicated to the
commercialization, development and discovery of new antiviral medicines. The Company has
purportedly focused its product development and discovery activities on a number of ribonucleic
acid (RNA) virus diseases, including viral respiratory infection (VRI), often referred to as the
common cold. Other disease in which ViroPharma focuses its product development activities on
include respiratory syncytial virus disease (RSV) and hepatitis C.

22.     Throughout the Class Period, defendants issued multiple statements which
highlighted the successful clinical trials of Picovir (pleconaril), a drug the Company had
developed to cure the common cold, and led investors to believe that pleconaril faced minimal, if
any, hurdles prior to being approved by the U.S. Food & Drug Administration ("FDA") for
marketing and production.  These statements, however, were materially false and misleading
because they failed to disclose, among other things, that: (i) pleconaril might produce resistant
strains of the cold virus, especially in patients who take the drug incorrectly; (ii) pleconaril shows
evidence of reducing the effectiveness of oral contraceptives, raising the risk of unwanted
pregnancies; (iii) some female users of pleconaril experienced excessive bleeding; (iv) pleconaril
had not proved to be successful with smokers with colds; and (v) as a result of all of these safety
concerns, it was very unlikely that pleconaril would be approved by the FDA for marketing and
production.

23.     On March 19, 2002, the last day of the Class Period, ViroPharma issued a press
release announcing that the Antiviral Drugs Advisory Committee of the FDA voted against
recommending pleconaril for approval.  According to the press release, the committee requested

that the Company provide additional data, which had not been included in the pivotal trials,

before the drug could be recommended for approval.  As reported in an article on

CBS.MarketWatch.com on March 20, 2002, the safety concerns raised by the panel included,

among other things, possible adverse interactions Picovir could have with other drugs, including

birth control pills.  The panel also believed the drug had only "modest" effectiveness.

24.     Following this announcement, shares of ViroPharma were halted for trading.  On

March 20, 2002, when the stock reopened for trading, shares of ViroPharma declined

significantly, falling almost $8 per share to close at $5.50 per share, an incredible 60% decline

from its previous close of $13.41.

**Materially False and Misleading Statements**
**Made During the Class Period**

25.     The Class Period begins on July 13, 1999.  On that day, defendants issued a press

release announcing the results of its Phase 2 trial of pleconaril, which was comprised of patients

with viral respiratory infection (VRI), a severe form of the common cold.  According to the press

release, the trial results indicated that "pleconaril-treated patients experienced a clinically and

statistically significant reduction in time to complete resolution of all disease symptoms, as well

as a reduction in the patient-reported time to return to feeling normal, as measured by a global

assessment score."   The press release further stated that:

> In all [three placebo-controlled]studies, there were no overall differences in
> adverse event profiles between pleconaril and placebo-treated patients.

Defendant Nash commented on the results of the tests and stated, in pertinent part, as follows:

> We've seen excellent results with pleconaril in patients with viral respiratory
> infection, a disease for which there are no available antiviral treatments.  Our plan

9

is to continue to pursue the path toward regulatory approval of this important new therapy. [Emphasis added.]

26.     Following this announcement, shares of ViroPharma more than doubled, climbing from $9.25 per share on July 12, 1999 to close at $19.13 per share on July 14, 1999.

27.     On July 30, 1999, defendants issued a press release reporting the Company's financial results for the second quarter, the period ended June 30, 1999.  Among other things, the press release described Pleconaril as "the Company's most advanced drug candidate."

28.     On September 22, 1999, ViroPharma issued a press release announcing that it had filed a registration statement with the SEC for the proposed sale of 3,000,000 newly issued shares of its common stock.  According to the press release, the proceeds were to be used for, among other things, "the further development and commercialization of pleconaril, its most advanced drug candidate."

29.      On October 22, 1999, ViroPharma announced that it had priced its public offering of 3,000,000 shares of its common stock at $19 per share.  Additionally, the press release stated that it would be using the proceeds for, among other things, "the further development and commercialization of pleconaril, its most advanced drug candidate."

30.     On February 16, 2000, defendants issued a press release announcing that the Company intended to issue $100 million of Convertible Subordinated Notes due 2007, with an option to issue an additional $20 million of notes, in a private offering, which notes would be convertible into shares of ViroPharma common stock and would be subordinated in right of payment to all senior indebtedness of ViroPharma.

31.    On February 25, 2000, the Company issued a press release announcing that it had increased its previously-announced private placement of convertible subordinated notes to $150 million, up from $100 million, and had priced the offering.  According to the press release, the Company intended to use the proceeds for, among other things, the commercialization of pleconaril.

32.    On April 11, 2000, the Company issued another press release in which it announced results from its three Phase 3 clinical studies of pleconaril.  The studies were conducted in two disease indications: viral respiratory infection (VRI) in adults and viral meningitis in adults and children.  The results of the studies showed that clinical benefits were generally greater in patients with confirmed picornavirus infection.  The adult patients in both indications purportedly showed improved time to resolution of disease based on various objective and subjective assessments of illness when compared to placebo-treated patients.  With regard to the VRI study, defendant Nash stated, in pertinent part, as follows:

> We are confident in pleconaril's ability to help these patients.  Our timeline for the completion of our clinical program and filing for regulatory approval for VRI is unchanged.

The press release also disclosed Picovir's lack of success in treating meningitis.  With regard to these results, defendant Nash stated, in pertinent part, as follows:

> ViroPharma plans to discuss the data from these studies in viral meningitis with the FDA.  We will determine the next steps to be taken for the use of pleconaril to treat viral meningitis, as well as the timing of those activities.

The press release also discussed the side effects experienced by participants in the studies, stating, in pertinent part, as follows:

> In all studies, adverse events were reported at a similar rate in
> pleconaril and placebo-treated patients, except mild nausea which
> was slightly higher in the pleconaril-treated patients. The
> frequency of nausea in the pleconaril-treated group compared to
> the placebo group in VRI was 7% versus 3%, in adult meningitis
> was 27% versus 20% and in pediatric meningitis was 1% in both
> groups.

33.    Following the Company's announcement of the drug's lack of success in treating

meningitis, the price of ViroPharma common stock fell from $71.75 per share to $23.25 per

share, a decline of more than 65%.

34.    On May 26, 2000, ViroPharma announced that it had filed a registration statement

with the SEC registering the resale of its 6% subordinated convertible notes due March 1, 2007.

35.    On March 15, 2001, defendants issued a press release announcing the successful

outcome of its pleconaril Phase 3 trial. Defendant de Rosen commented on this achievement and

stated, in pertinent part, as follows:

> Picovir(TM) is an exceptional product candidate. Our goal is to make it a
> commercial success. Achieving statistically significant results in these two
> pivotal trials is the most important milestone that ViroPharma has accomplished
> to date. With this event, and our recent negotiations of the Sanofi-Synthelabo
> agreement, we will file an NDA for Picovir(TM) and select a top-tier marketing
> partner. Moreover, we will pursue additional indications for the product, and we
> intend to create a strong commercial presence.

36.    On March 16, 2001, Emerging Growth Equities, Ltd. issued a press release

announcing that, as a result of Picovir's successful trials,  it had upgraded shares of ViroPharma

stock to "Strong Buy" from a "Speculative Buy" rating and reiterated its 12-month price target of

$48 per share.

37.     On July 31, 2001, ViroPharma announced that it had submitted a new drug application ("NDA") to the FDA for clearance to market Picovir.  Defendant de Rosen commented on this development, stating in pertinent part, as follows:

> This is a tremendous accomplishment to have filed ViroPharma's
> first NDA ahead of our targeted submission date. We look forward
> to productive interactions with the FDA.  This effort underscores
> our commitment to advancing Picovir toward commercialization.
> We are fervently working toward achieving the next set of
> milestones for the company, which includes securing a co
> promotion and co development partner for Picovir(tm).

38.     On September 10, 2001, ViroPharma issued a press release announcing its collaboration with Aventis Pharmaceuticals for the co-promotion and co-development of Picovir.

39.     On September 30, 2001, ViroPharma issued a press release announcing that its NDA for pleconaril had been accepted for review by the FDA.  The press release also discussed other ongoing trials of pleconaril and with regard to the drug's side-effects, stated that "Picovir(TM) was well tolerated, with a side effect profile similar to placebo."

40.     On November 15, 2001, ViroPharma issued a press release announcing that it had entered into an underwriting agreement for the sale of 4,000,000 shares of its common stock, which was expected to raise $82.8 million before offering expenses.  According to the press release, the Company intended to use the proceeds for, among other things, the anticipated commercialization of Picovir.

41.     On March 14, 2002, ViroPharma shares fell 18% following a research report from Fulcrum Global Partners which initiated coverage with a "sell" rating.  Mark Augustine, an analyst at U.S. Bancorp Piper Jaffray, disagreed, however, and advised his clients that he expected the drug to win approval, albeit by a narrow margin.

42.    The statements issued above in ¶¶ 25, 27–29, 31, 32, 35, 37, 39 and 40 were materially false and misleading because they failed to disclose, among other things, that: (i) pleconaril might produce resistant strains of the cold virus, especially in patients who take the drug incorrectly; (ii) pleconaril shows evidence of reducing the effectiveness of oral contraceptives, raising the risk of unwanted pregnancies; (iii) some female users of pleconaril experienced excessive bleeding; (iv) pleconaril had not proved to be successful with smokers with colds; and (v) as a result of all of these safety concerns, it was very unlikely that pleconaril would be approved by the FDA for marketing and production.

## THE TRUTH IS REVEALED

43.    On March 19, 2002, the last day of the Class Period, ViroPharma issued a press release announcing that the Antiviral Drugs Advisory Committee of the FDA voted against recommending pleconaril for approval.  According to the press release, the committee requested that the Company provide additional data, which had not been included in the pivotal trials, before the drug could be recommended for approval.  As reported in an article on CBS.MarketWatch.com on March 20, 2002, the safety concerns raised by the panel included, among other things, possible adverse interactions Picovir could have with other drugs, including birth control pills.  The panel also believed the drug had only "modest" effectiveness.

44.    Moreover, Darren Mac, an analyst with Fulcrum Global Partners, reported that if the FDA agrees with the finding of its advisory panel, which it typically does, and also concludes that Picovir's application should be denied, ViroPharma's joint venture with Aventis could be in jeopardy.  Under the terms of their agreement, ViroPharma would be required to refund up to $20

million of Aventis' $25 million investment in ViroPharma if certain milestones are not met, including the approval of Picovir.

45.    Following this announcement, shares of ViroPharma were halted for trading.  On March 20, 2002, when the stock reopened for trading, shares of ViroPharma declined significantly, falling almost $8 per share to close at $5.50 per share, an incredible 60% decline from its previous close of $13.41.

46.    The market for ViroPharma's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, ViroPharma's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired ViroPharma securities relying upon the integrity of the market price of ViroPharma's securities and market information relating to ViroPharma, and have been damaged thereby.

47.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of ViroPharma's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

48.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading

statements about ViroPharma's products and future prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ViroPharma and its products and future prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

49.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding ViroPharma, their control over, and/or receipt and/or modification of ViroPharma's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ViroPharma, participated in the fraudulent scheme alleged herein.

50.    Defendants were motivated to perpetrate the fraudulent scheme and course of business described herein in order to enable ViroPharma insiders to sell more than $35 million worth of their personally-held ViroPharma common stock during the Class Period and in order to

16

successfully raise hundreds of millions of dollars through the sale of additional securities to the unknowing public.

**Applicability Of Presumption Of Reliance:
Fraud-On-The-Market Doctrine**

51.    At all relevant times, the market for ViroPharma's securities was an efficient market for the following reasons, among others:

(a)  ViroPharma's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, ViroPharma filed periodic public reports with the SEC and the NASDAQ;

(c)  ViroPharma regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  ViroPharma was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

52.    As a result of the foregoing, the market for ViroPharma's securities promptly digested current information regarding ViroPharma from all publicly available sources and reflected such information in ViroPharma's stock price. Under these circumstances, all

purchasers of ViroPharma's securities during the Class Period suffered similar injury through their purchase of ViroPharma's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

53.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ViroPharma who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

54.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding ViroPharma's business, operations, management and the intrinsic value of ViroPharma common stock;  (ii) enable ViroPharma insiders to sell more than $35 million worth of their personally-held ViroPharma common stock during the Class Period; (iii) enable ViroPharma to raise hundreds of millions of dollars though the sale of additional securities to the unknowing public; and (iv) cause plaintiff and other members of the Class to purchase ViroPharma securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

56.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ViroPharma's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of ViroPharma as specified herein.

58.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ViroPharma's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ViroPharma and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ViroPharma securities during the Class Period.

59.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's man-agement team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the

Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

60.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ViroPharma's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ViroPharma's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of ViroPharma's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by

defendants during the Class Period, plaintiff and the other members of the Class acquired

ViroPharma securities during the Class Period at artificially high prices and were damaged

thereby.

62.    At the time of said misrepresentations and omissions, plaintiff and other members

of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the

other members of the Class and the marketplace known the truth regarding the problems that

ViroPharma was experiencing, which were not disclosed by defendants, plaintiff and other

members of the Class would not have purchased or otherwise acquired their ViroPharma

securities, or, if they had acquired such securities during the Class Period, they would not have

done so at the artificially inflated prices which they paid.

63.    By virtue of the foregoing, defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

64.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's securities during the Class Period.

### SECOND CLAIM

**Violation Of Section 20(a) Of**
**The Exchange Act Against the Individual Defendants**

65.    Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

66.    The Individual Defendants acted as controlling persons of ViroPharma within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

statements which plaintiff contends are false and misleading.  The Individual Defendants were

provided with or had unlimited access to copies of the Company's reports, press releases, public

filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

       67.     In particular, each of these defendants had direct and supervisory involvement in

the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same.

       68.     As set forth above, ViroPharma and the Individual Defendants each violated

Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue

of their positions as controlling persons, the Individual Defendants are liable pursuant to Section

20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct,

plaintiff and other members of the Class suffered damages in connection with their purchases of

the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

Dated:   May 16, 2002

**SCHIFFRIN & BARROWAY, LLP**

By: _____
Marc A. Topaz, Esquire
Darren J. Check, Esquire
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
Telephone:  (610) 667-7706
Fax: (610) 667-7056

**CAULEY GELLER BOWMAN &
COATES, LLP**
Paul J. Geller, Esquire
Jonathan M. Stein, Esquire
2255 Glades Road, Suite 421A
Boca Raton, FL  33431
Telephone: (561) 750-3000
Fax: (561) 750-3364

**Attorneys for Plaintiff**
